IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES BAILEY,

        Plaintiff,

v.

TEKTRONIX, Inc.

        Defendant.

Civil Action No. 21-1268-GBW

---

Robert Karl Beste, III, Jason Z. Miller, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware

    *Counsel for Plaintiff*

Anthony David Raucci, Donna Lynn Culver, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware

    *Counsel for Defendant*

**MEMORANDUM OPINION**

September 12, 2022
Wilmington, Delaware

_____<br>
GREGORY B. WILLIAMS<br>
U.S. DISTRICT JUDGE

Plaintiff James Bailey filed this action against Defendant Tektronix, Inc. (Tektronix) to recover funds owed to him in connection with Tektronix's acquisition of Bailey's company, Initial State Technologies, Inc. (IST). D.I. 12 ¶¶ 1, 5. Bailey's Amended Complaint (the Complaint, D.I. 12) alleges breach of contract, violation of Delaware's implied covenant of good faith and fair dealing, and violation of Oregon wage laws. Pending before the Court is Tektronix's Motion to Dismiss the Amended Complaint for Failure to State a Claim (D.I. 14). Under one provision of an agreement between the parties, Tektronix must compensate Bailey based on sales of products and services that use IST's intellectual property. D.I. 16-1 at A2, A3. Tektronix argues this provision should be read narrowly. D.I. 15 at 3. Bailey argues that it should be read broadly. D.I. 19 at 1–2. Because a broad reading is plausible, the Court will deny in part Tektronix's Motion.

## I.  BACKGROUND[1]

Bailey, a Tennessee resident, founded IST in 2012. D.I. 12 ¶¶ 3, 5. IST's intellectual property included software products used "to send data from web-connected devices, sensors, and applications . . . to a reliable, secure, scalable cloud . . . ." D.I. 12 ¶ 5. Tektronix is an Oregon corporation registered to do business in Delaware. D.I. 12 ¶ 4. In 2017, Tektronix sought to acquire IST to use IST's intellectual property "in the oscilloscopes Tektronix manufactured. . . . Notably, Tektronix was not interested in IST's existing software product and users." D.I. 12 ¶ 6. Tektronix explains, and Bailey does not contest, that

---

[1] Under Rule 12(b)(6), the Court must accept as true all factual allegations in the Complaint and view those facts in the light most favorable to the plaintiff. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020).

1

> [a]n oscilloscope is an instrument that graphically displays electrical voltage signals as a function of time. Tektronix has been selling oscilloscopes since its founding in 1946. A multimeter is an instrument that typically can measure electrical voltage, resistance, and current. Multimeters have been in use for nearly a century.

D.I. 15 at 13 n.7.

On January 5, 2018, IST and Tektronix entered an Agreement and Plan of Merger (the Merger Agreement, D.I. 16-1, Ex. B) that merged IST into Tektronix. D.I. 12 ¶¶ 7–8. The parties simultaneously entered a Retention Holdback Agreement (the RHA, D.I. 16-1, Ex. A) that withheld up to $800,000 in funds Bailey would have received in connection with the merger (the Retention Holdback Amount). D.I. 12 ¶ 9; D.I. 16-1 at A1. The $800,000 included $740,000 "that would otherwise be payable to [Bailey] as a holder of [IST] Common Stock" and $60,000 that constituted Bailey's share of an "Escrow Fund" created to compensate Tektronix for certain "indemnification claims" available to it under the Merger Agreement. D.I. 16-1 at A1, B26.

The RHA provides that

> [n]o later than January 15, 2021, [Bailey] will be paid an amount in cash, which amount will not exceed the Retention Holdback Amount, equal to 20% of each dollar of Revenue, but only if [Bailey] (i) is continuously employed by [Tektronix] from the Closing Date through December 31, 2020 . . . .

D.I. 16-1 at A2; D.I. 1 ¶ 9. The RHA defines "Revenue" as

> each dollar of gross revenue in excess of $6,000,000 (but . . . less than or equal to $10,000,000) generated during 2020 by [Tektronix] from or with respect to any software that contains any of the intellectual property owned by [IST] as of the Closing Date.

D.I. 16-1 at A3; D.I. 1 ¶ 9. While the RHA does not further discuss "intellectual property," the Merger Agreement and its disclosure schedules show that IST solely owned only four patents filed on August 2, 2016. D.I. 16-1 at B10, B46, C5, C18.

2

Tektronix "implemented" IST's intellectual property in two places: First, Tektronix "heavily leveraged existing IST infrastructure and intellectual property" in its Marshall Module; Tektronix used the Marshall Module both to "connect Tektronix's oscilloscopes to the cloud" and as part of software that supports oscilloscope operation. D.I. 12 ¶¶ 14–16. Tektronix also incorporated IST's intellectual property into "the software operating the Keithley DAQ 6500/6510 Data Acquisition and Logging, Multimeter System" (the Keithley System). D.I. 12 ¶ 17. The Keithley System is a digital multimeter that, according to Tektronix's website, allows users to "[s]tream and log data to secure cloud-based data visualizations[.]" DAQ6510 Data Acquisition and Logging, Multimeter System, Tektronix (Accessed September 6, 2022), https://www.tek.com/en/products/keithley/digital-multimeter/keithley-daq6510.

> Bailey alleges that,
>
>> the oscilloscopes and devices in which IST's intellectual property was incorporated (whether such intellectual property is essential or necessary to operate such oscilloscopes) earned far more than $10,000,000 in gross revenue in 2020.

D.I. 12 ¶¶ 13, 21. The RHA's section on tax reporting states that the parties

> agree (a) to treat any payment of the Retention Holdback Amount to [Bailey] as payment made in exchange for [Bailey]'s [IST] Common Stock . . . and not as compensation for services and (b) to report for income Tax purposes any payment of the Retention Holdback Amount to [Bailey] as consideration for [Bailey]'s [IST] Common Stock . . . and not as compensation for services . . . .

D.I. 16-1 at A3.

After Tektronix acquired IST, Bailey joined Tektronix as an employee and was told to focus "all efforts . . . to the further development of software to be sold fully integrated in Tektronix's core business line[,] which is mixed signal oscilloscopes." D.I. 12 ¶ 19. Tektronix

3

employed Bailey through May 21, 2021; Bailey visited Tektronix's headquarters to perform work six times per year, and he stayed for several days at a time each time. D.I. 12 ¶¶ 12, 22.

Tektronix failed to repay the entire $800,000 that Bailey claims he is owed under the RHA by January 15, 2021. Thereafter, Bailey filed and then voluntarily withdrew a breach of contract claim in Delaware state court and then filed an initial complaint before this Court on September 3, 2021. D.I. 1; D.I. 15 at 2; D.I. 19 at 1. After Tektronix moved to dismiss, D.I. 6, Bailey withdrew his initial complaint and filed the Complaint on November 17, 2021. D.I. 12; D.I. 19 at 1.

Bailey's Complaint sounds in three counts: breach of the RHA; violation of the implied covenant of good faith and fair dealing under Delaware law; and violation of Oregon Revised Statute § 652.150, a statute that imposes penalties on employers that "willfully fail[] to pay any wages or compensation to any employee . . . ." D.I. 12 ¶¶ 23–49. Tektronix moves to dismiss the Complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). D.I. 14. The motion is fully briefed, and no hearing is necessary.

## II. LEGAL STANDARD

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal

4

conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

"'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), aff'd, 2018 WL 11446482 (3d Cir. Apr. 6, 2018). Rule 12(b)(6) requires the court to accept all factual allegations in the complaint as true and view them in the light most favorable to plaintiff. *AbbVie Inc*, 976 F.3d at 351. The court may consider matters of public record and documents attached to, "integral to[,] or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (same). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420).

## III.   DISCUSSION

A plausible reading of revenue generated "from or with respect to any software that contains any of the intellectual property owned by [IST,]" D.I. 16-1 at A3, could include revenue tied to the sale of all products that include the software at issue. Thus, the Court will deny Tektronix's Motion to Dismiss as to the breach of contract allegation. The Court will grant Tektronix's Motion as to Bailey's other claims: Bailey fails to state a claim for violation of Delaware's implied covenant of good faith and fair dealing because the implied covenant does not cover express contractual rights. Bailey also fails to state a claim for violation of Oregon

5

wage laws, since the RHA does not treat the Retention Holdback Amount as compensation for services.

## A. Breach of Contract

Whether the RHA's "Revenue" definition reaches beyond sales of software is ambiguous at this stage. Thus, Bailey's breach of contract claim may go forward.

The parties agree that the RHA should be interpreted under Delaware law. *See* D.I. 15 at 11 & n.6; D.I. 16-1 at A4; D.I. 19 at 10 (applying Delaware law). Delaware law, as the Delaware Supreme Court explained earlier this year, requires

> plaintiffs [to] establish the following three elements to succeed on a breach of contract claim: (1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach.

*GEICO Gen. Ins. Co. v. Green*, 276 A.3d 462 (Del. 2022) (footnote omitted). Here, the existence of the RHA and damages—failure to make payments due under the RHA—are uncontested. At issue is whether Tektronix breached the RHA.

When interpreting a contract, Delaware courts seek to "fulfill the 'parties' shared expectations at the time they contracted'" and "'interpret clear and unambiguous terms according to their ordinary meaning'" based on how "'an objective, reasonable third party'" would understand a contract's terms. *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (citations omitted); *see also Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 2022 WL 619700, at *5 (Del. Mar. 3, 2022) ("[Delaware's] approach places great weight on the plain terms of a disputed contractual provision . . . ."). Delaware courts construe contracts "as a whole and . . . give each provision and term effect, so as not to render any part . . . mere surplusage." *United States v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1129 (Del. 2020) (internal quotations and citations omitted).

6

Sources outside the four corners of a contract may shed light on the contract's meaning. "Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) (citations omitted). Delaware courts impose a "rule that related contemporaneous documents should be read together . . . ." *Ashall Homes Ltd. v. ROK Ent. Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010) (collecting authorities).

Terms, of course, do not always have one plain and unambiguous meaning.

> [Delaware courts] do not consider extrinsic evidence unless [they] find that the text is ambiguous. Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Critically, a contractual provision is "not rendered ambiguous simply because the parties in litigation differ" as to the proper interpretation.

*Cox Commc'ns*, 2022 WL 619700, at *5 (citations omitted).

Tektronix agreed in the RHA to pay Bailey "20% of each dollar of Revenue," D.I. 16-1 at A2, and the RHA defines "Revenue" as

> each dollar of gross revenue in excess of $6,000,000 . . . generated during 2020 by [Tektronix] ***from or with respect to any software*** that contains any of the intellectual property owned by [IST] as of the Closing Date.

D.I. 16-1 at A3 (emphasis added). Tektronix argues that "revenue must be tied to the sale or license of software—whether that be subscription revenue or technical support relating to use of the cloud-based software platform." D.I. 15 at 13. Tekronix further offers that Bailey should receive credit for the software component of products that integrate hardware and software. D.I. 21 at 5. Bailey argues that "Revenue" "covers revenue from any device sold by the company that uses or implements the intellectual property in any way whatsoever . . . ." D.I. 19 at 11.

7

Bailey argues in the alternative that the existence of two plausible interpretations means the issue cannot be resolved on the pleadings. D.I. 19 at 12.

The Court first looks to how the parties use the phrase at issue elsewhere in the RHA. Neither the RHA nor the Merger Agreement repeat the phrase "from or with respect to." The RHA uses "with respect to" three other times, as follows:

> [The RHA], the Merger Agreement, and the documents and instruments and other agreements that are referenced herein or in the Merger Agreement constitute the entire agreement among the parties *with respect to* the subject matter hereof and supersede all prior and contemporaneous agreements, arrangements, communications, and understandings, both written and oral, among the parties *with respect to* the subject matter hereof (other than any non-competition or non-solicitation agreement executed by [Bailey] prior to the date of [the RHA] for the benefit of [Tektronix]). . . .
> . . .
> . . . No waiver by any party *with respect to any* condition, default, or breach of covenant hereunder will be deemed to extend to any prior or subsequent condition, default or breach of covenant hereunder or affect in any way any rights arising by virtue of any such occurrence.

D.I. 16-1 at A4–A5 (emphases added). The combination of "with respect to" and "any" in the third example, but not in the first two, suggests that the parties intended to give "with respect to" a broader scope when they add "any."

The Court also turns to the Merger Agreement for assistance understanding the RHA because the parties executed the RHA "as a material inducement to the willingness of [Tektronix] to enter into the Merger Agreement . . . ." D.I. 16-1 at A1. The Merger Agreement required IST to agree that the performance or execution of the Merger Agreement would not "result in, or give any other Person the right or option to cause or declare: . . . a reduction of any royalties or other payments [IST] would be entitled to *with respect to any* Company IP [i.e., intellectual property "in which [IST] has any right, title or interest," D.I. 16-1 at B41] . . . ." D.I.

8

16-1 at B11 (emphasis added). In context, an objective reader of this provision would find that it applies to a broad scope of IST's intellectual property.

The RHA uses the term "software" only in its "Revenue" definition and does not further define the term. D.I. 16-1 at A3. The Merger Agreement uses the word "software" in its definitions of "Computer Software," "Open Source Materials," and "Technology." D.I. 16-1 at B42, B45, B47. "Computer Software" includes "software manufacturing instructions." D.I. 16-1 at B42. "Open Source Materials" include "any software that (1) contains . . . any software that is distributed as free software, [or] open source software . . . ." D.I. 16-1 at B45. The definition of "Technology" includes "software" in a list with, among other terms, "products, tools, devices, . . . algorithms, methods, processes, . . . user interfaces, . . . inventions (whether or not patentable), invention disclosures, [and] discoveries . . . ." D.I. 16-1 at B47. None of these provisions define "software," though the "Technology" definition distinguishes "software" from "products" and "devices."

Dictionary definitions provide additional guidance as to how "a reasonable person in the position of a party to a contract" would understand "the ordinary meaning" of a contract's terms. *Lorillard Tobacco*, 903 A.2d at 738. Merriam Webster's Unabridged Dictionary—in the definition of "respect"—states that "with respect to" means "as regards," "insofar as concerns," and "with reference to." *Respect*, Merriam-Webster's Unabridged Dictionary (Accessed May 2, 2022), https://unabridged.merriam-webster.com/unabridged/respect. "Software" means "something used or associated with and usually contrasted with hardware." *Software*, Merriam-Webster's Unabridged Dictionary (Accessed May 2, 2022), https://unabridged.merriam-webster.com/unabridged/software.

9

After examining the RHA, the Merger Agreement, and dictionary definitions, Bailey is correct that two readings of the phrase "from or with respect to any software" are plausible. The ordinary, objective meaning of "gross revenue . . . generated . . . from . . . any software" includes revenue from direct software sales. To avoid a reading that renders "with respect to" mere surplusage, the Court must construe "gross revenue . . . generated . . . with respect to any software" to extend beyond such direct sales. However, nothing in the RHA clarifies whether the "Revenue" definition includes sales of hardware that contains the software at issue or only software and services sold therewith. While the ordinary meaning of software contrasts with that of hardware, the use of "with respect to" suggests the drafters intended to capture revenue that refers to or "concerns" "any" of the referenced software, a broad reading that would include related hardware. Also, the facts alleged in the pleadings point to Bailey's broader reading as the better one: Tektronix sought to acquire IST to use IST's intellectual property "in the oscilloscopes Tektronix manufactured." D.I. 12 ¶ 6. Bailey, as a Tektronix employee, was told to focus "all efforts . . . to the further development of software to be sold fully integrated in . . . mixed signal oscilloscopes." D.I. 12 ¶ 19. A "Revenue" provision capable of two plausible readings is ambiguous.

Tektronix offers three responses, but none of them are availing. First, Tektronix argues that the Merger Agreement's disclosure schedules show that "the only intellectual property that IST owned related to a software as a service platform . . . ." D.I. 15 at 13. Tektronix could have—and allegedly did—use that software in its oscilloscopes and multimeters. Bailey alleges that these products "are equal parts hardware and software." D.I. 12 ¶ 18.

Second, Tektronix argues that "[i]t would be illogical for the parties to tie the Revenue condition to all revenue from sales of oscilloscopes or multimeters, or any other device, whose

10

core functions were developed by Tektronix, or others, long before the acquisition of IST." D.I. 15 at 14. Tektronix also argues that "none of the software acquired from [IST] in 2018 enabled Tektronix to sell [] oscilloscopes." D.I. 21 at 4. Bailey alleges that Tektronix's devices required software to function. D.I. 1 ¶¶ 18–19. If IST's intellectual property improved Tektronix's existing products, Tektronix could logically credit Bailey with twenty percent of those products' sales. To the extent Tektronix alleges facts that differ from those in the Complaint, the Court may not credit them at this stage of the action.

Third, Tektronix argues that, because the Merger Agreement defines "'Computer Software' without reference to devices" but defines "'Technology' as including devices," the parties "understood the difference between tying the Revenue condition to software specifically as opposed to tying it more broadly to Tektronix's products containing software . . . ." D.I. 15 at 15; *see also* D.I. 21 at 4 ("[T]he agreements show that the parties knew how to draft the Revenue condition to include revenue from devices if that was the intent."). The Court agrees with Tektronix that the Merger Agreement differentiates hardware and software. However, Bailey alleges that Tektronix's hardware incorporates software that IST improved.

Both parties assert a plausible reading of "gross revenue . . . generated . . . from or with respect to any software" that contains IST's intellectual property: Tektronix may derive such revenue from sales of software and related products, alone, or also from hardware that includes the software at issue. Thus, the phrase is ambiguous, and the external evidence available at this stage points to Bailey's broader reading that includes hardware. Bailey alleges "upon information and belief" that "oscilloscopes and devices in which IST's intellectual property was incorporated . . . earned far more than $10,000,000 in gross revenue in 2020." D.I. 12 ¶ 21. Since 20% of the difference between $10 million and $6 million equals $800,000, Bailey has

11

stated a claim, at least at this early stage, that he is entitled to receive the entire Revenue Holdback Amount.

## B. Delaware's Implied Covenant of Good Faith and Fair Dealing

Bailey further alleges that Tektronix used the "Revenue" definition "to avoid paying Mr. Bailey the Retention Holdback Amount" and, thus, "has acted in bad faith, with an improper motive and has unfairly dealt with Mr. Bailey." D.I. 12 ¶ 37. However, Bailey fails to allege facts that support a plausible claim for violation of Delaware's implied covenant of good faith and fair dealing here.

Delaware's implied covenant of good faith and fair dealing "'cannot be invoked to override the express terms of the contract.'" *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)). Rather, for a plaintiff to state a claim for breach of the implied covenant, the plaintiff "'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Kuroda*, 971 A.2d at 888 (citation omitted). In *Kuroda*, the Court of Chancery found that an implied covenant claim "premised on the failure of defendants to pay money due under the contract . . . must fail because the express terms of the contract will control such a claim." *Id.*; *see also In re Nat'l Collegiate Student Loan Trusts Litig.*, 251 A.3d 116, 196 (Del. Ch. 2020) ("[T]he implied covenant is . . . used to infer contractual terms to which the parties would have agreed had they anticipated a situation they failed to address." (internal quotations and citation omitted)).

Bailey argues that he "was justified in his expectation that, under the terms of the RHA, revenue from the sale of all products incorporating software containing IST's intellectual property would count towards the achievement of Revenue as defined by the RHA." D.I. 19 at

12

15. Bailey added that "he would not have agreed to the terms of the RHA, as Tektronix now purports to understand them . . . ." D.I. 19 at 15. In other words, Bailey argues that Tektronix acted in bad faith because Tektronix breached the RHA. However, Bailey admits that the implied covenant "is invoked only where the contract is silent with respect to the issue in dispute." D.I. 19 at 14 (internal quotations and citation omitted). In short, the only contractual obligation Bailey invokes is an express obligation, not an implied obligation, and Bailey must allege an implied obligation to invoke the implied covenant. *Kuroda*, 971 A.2d at 888. Thus, the Court will dismiss Bailey's claim for violation of Delaware's implied covenant of good faith and fair dealing.

## C. Oregon Wage Law Violations

The Court will also dismiss Bailey's claims under Oregon's wage statutes because the parties agreed that the Retention Holdback Amount was compensation for Bailey's ownership of IST, not for Bailey's work on behalf of Tektronix.

Oregon law provides that,

> if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases, . . . then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced.

Or. Rev. Stat. § 652.150(1). To recover, Bailey must show that he was an employee and that Tektronix failed to pay Bailey "wages or compensation."

Tektronix argues that Bailey does not qualify as an "employee" under Oregon law, since Bailey worked primarily in Tennessee and "it is not apparent" that Bailey's contract for employment was made in Oregon. D.I. 21 at 10. Bailey alleges that he performed on-site work for Tektronix in Oregon and that he "performed work for Tektronix in Oregon remotely from his

13

home." D.I. 12 ¶ 40. Since neither party has submitted Bailey's employment agreement with Tektronix, the allegations in the Complaint require that the Court reject Tektronix's argument.

Section 652.150 does not define "wages or compensation," so the Court turns to the statute's "ordinary meaning." *White v. Jubitz Corp.*, 182 P.3d 215, 217 (Or. App. 2008), aff'd, 219 P.3d 566 (Or. 2009). The Oregon Court of Appeals found that "wages" "is commonly understood to encompass compensation for labor or services." *Wyatt v. Body Imaging, P.C.*, 989 P.2d 36, 40–41 (Or. App. 1999); *see also Hekker v. Sabre Const. Co.*, 510 P.2d 347, 351 (Or. 1973) (holding that § 652.200 extends to commissions and noting that § 652.150 is broader). Section 652.210—a section adjacent to § 652.150 that relates to discriminatory wage practices, *see Lamy v. Jack Jarvis & Co.*, 574 P.2d 1107, 1111 (Or. 1978) (using § 652.210 to assist in construing the term "employee" under § 652.150)—defines "wages" as "all compensation for performance of service by an employee for an employer . . . ." Or. Rev. Stat. § 652.210(14). The same section states that "compensation" includes "wages, salary, bonuses, benefits, fringe benefits and equity-based compensation." Or. Rev. Stat. § 652.210(1)(a). Employers pay each form of compensation in exchange for services. Indeed, the penalty for failure to pay "wages or compensation" in § 652.150(1) is that "the wages or compensation of the employee shall continue[,]" and it makes little sense to "continue" compensation unless the compensation is proportional to the services rendered (e.g., hourly wages). In short, "wages and compensation" refers only to remuneration for services.

Here, the RHA requires Bailey to maintain employment with Tektronix to receive the Retention Holdback Amount. D.I. 16-1 at A2. However, the RHA provides that Tektronix and Bailey "agree (a) to treat any payment of the Retention Holdback Amount to [Bailey] as payment made in exchange for [Bailey]'s [IST] Common Stock . . . and not as compensation for services

14

. . . ." D.I. 16-1 at A3. Bailey argues that this provision was limited to income tax reporting, D.I. 19 at 17, but the relevant provision separately specifies the parties' obligations "to treat" and "to report" the Retention Holdback Amount as compensation for stock and not for services. D.I. 16-1 at A3. In fact, most of the Retention Holdback Amount is $740,000 "that would otherwise be payable to [Bailey] as a holder of [IST] Common Stock at Closing . . . ." D.I. 16-1 at A1.[2]

Bailey cites to an Oregon case that suggests compensation similar to that contained in the RHA may be compensation for services rendered. D.I. 19 at 16 (citing *Pollock v. D.R. Horton, Inc.-Portland*, 77 P.3d 1120 (Or. App. 2003)). However, that case is distinguishable because it was premised on the breach of Oregon's implied covenant of good faith, not on Oregon's wage laws, and because the Oregon Court of Appeals never made a finding that the "earn out" at issue was compensation for services rendered. *Pollock*, 77 P.3d at 1129.

Bailey fails to allege sufficient facts to show that the Retention Holdback Amount constituted "wages or compensation" under § 652.150. The RHA tied the Retention Holdback Amount to IST stock ownership, and Tektronix could not "continue" such a fixed lump sum payment, as § 652.150 requires. For those reasons, the Court will dismiss Bailey's claim for violation of Oregon's wage laws.

---

[2] The Retention Holdback Amount also includes up to $60,000 "withheld from any amounts payable to [Bailey] from the Escrow Fund . . . ." D.I. 16-1 at A1. The Merger Agreement requires contributions to the "Escrow Fund" on behalf of former IST stockholders. Amounts that remained in the "Escrow Fund" after Tektronix received all compensation due to it would be divided among the stockholders based on the proportion of total IST stock they owned. D.I. 16-1 at B23, B28, B43. So that $60,000, too, is tied to stock ownership, not employment.

15

## IV. CONCLUSION

For the above reasons, the Court will deny Tektronix's Motion to Dismiss as to Bailey's breach of contract claim. The Court will grant the Motion as to Bailey's claims for violation of Delaware's implied covenant of good faith and fair dealing and of Oregon's wage laws.

Federal Rule of Civil Procedure 15(a)(2) requires the Court to "freely give leave [to amend] when justice so requires." But dismissal with prejudice for futility is appropriate when "'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 243 (3d Cir. 2010) (citation omitted). Here, Bailey's claim for violation of Delaware's implied covenant of good faith and fair dealing arises from the breach of an express contractual provision, D.I. 12 ¶ 35; however, no claim for a violation of the implied covenant of good faith and fair dealing lies where "the express terms of the contract will control such a claim." *Kuroda*, 971 A.2d at **888**. The RHA provides that Tektronix paid the Retention Holdback Amount "in exchange for [Bailey]'s [IST] Common Stock . . . and not as compensation for services . . . ." D.I. 16-1 at A3. Bailey cannot sustain a claim for failure to pay compensation for services rendered under Oregon law. No additional factual allegations—provided that they are consistent with the RHA and the Merger Agreement—could make either claim one on which relief can be granted. Both claims should be dismissed with prejudice.

The Court will issue an Order consistent with this Memorandum Opinion.