IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES BAILEY,

            Plaintiff,

v.

TEKTRONIX, INC.,

            Defendant.

Civil Action No. 21-1268-GBW

---

Robert Karl Beste, III, Jason Z. Miller, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware

    *Counsel for Plaintiff*

Anthony David Raucci, Donna Lynn Culver, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware

    *Counsel for Defendant*

**OPINION**

February 23, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE

The Court held a one-day bench trial on the issue of breach of contract brought by Plaintiff James Bailey (herein, "Plaintiff" or "Mr. Bailey").[1] *See* D.I. 56 (Pretrial Order). Mr. Bailey alleges that Defendant Tektronix, Inc. (herein, "Defendant" or "Tektronix") breached the terms of the Retention Holdback Agreement ("RHA") by failing to pay him the retention holdback amount identified in the RHA despite his allegation that specific revenue targets were attained as set forth in the RHA. *Id.* at 2. The parties have submitted post-trial briefing in the form of proposed findings of fact and conclusions of law, *see, e.g.*, D.I. 61; D.I. 62

The Court has separately set forth its findings of fact and conclusion of law as required by Federal Rule of Civil Procedure 52(a)(1).

## I. FINDINGS OF FACT[2]

### A. Plaintiff is Co-Founder of Initial State Technologies, Inc.

1. Plaintiff James Bailey and co-founder David Sulpy started a company called Initial State Technologies, Inc. ("IST") that operated on a SaaS revenue model, meaning it sold subscriptions to the cloud-based Initial State platform. Tr.[3] 70:6-13; 70:14-25; 71:19-21; JTX-106 at 2; DTX-17 at 9632.

2. The Initial State platform allowed users to stream, store, and analyze data from web-connected devices and applications. JTX-106 at 2; DTX-17 at 9632.

---

[1] This Court entered a Memorandum Opinion and Order granting the dismissal of Plaintiff's other counts but denying the motion to dismiss with respect to Count I – Breach of Contract. D.I. 22; D.I. 23.
[2] The Court's Findings of Fact are cited as "FF ¶ __."
[3] "Tr." refers to Nov. 28, 2023 Bench Trial Transcript.

2

3. A customer of IST's would use its technology by implementing its APIs in the software of whatever device the customer manufactured (for example, a refrigerator) so that the device could "talk" to IST's internet service. Tr. 31:13-25. Then, the devices' users would have an application that would also use those APIs to view whatever data was being uploaded. Tr. 32:2-12.

4. In 2015, IST launched and, at that time, its intellectual property consisted of four things: 1) patents, 2) trademarks, 3) copyrights, and 4) trade secrets. Tr. 24:7- 25:6. The APIs that IST created constituted intellectual property owned by IST.

### B. The Acquisition of IST by Tektronix and Negotiation of the RHA

5. In 2016, after having licensing agreement discussions with National Instruments, IST received "some unsolicited acquisition offers." Tr. 26:4-11. Once IST's discussions regarding acquisitions became more serious, IST hired Menalto Advisors, which acted as IST's merger and acquisition advisors. Tr. 26:12-19. Menalto Advisors assisted IST in evaluating IST's market value and determining suitable targets to acquire IST. Tr. 26:20-27:3.

6. In 2017, Tektronix, Inc., its parent Fortive Corp., and IST had discussions relating to a potential acquisition of IST by Tektronix. Tr. 71:22-72:20; 73:8-14. On behalf of Mr. Bailey and IST, these discussions were facilitated by Charles Welch and Erik Hansen at Menalto Advisors, and the law firm Cooley LLP. *Id.* Menalto introduced Bailey to Pat Byrne, the President of Tektronix at the time, Chris Witt at Tektronix, and Chris Elston at Fortive. *Id.*

7. Tektronix is a company that manufactures oscilloscopes, which allow users to visualize or see electronic signals on a circuit board. Tr. 32:16-21. This allows the oscilloscope user to understand why a circuit board is not functioning properly, which cannot be accomplished by simply looking at the circuit board. Tr. 32:22-33:9. Oscilloscopes have

3

software integrated into them that the user interfaces with to see the signals and analyze them. Tr. 33:10-17, 237:9-17.

8. During negotiations between the companies, Tektronix's oscilloscopes did not have the capability to communicate with the cloud and Mr. Byrne specifically informed Plaintiff that he wanted IST to be the epicenter of the cloud technology initiatives for Tektronix. Tr. 35:9-20.

9. In September 2017, IST received a letter of intent from Tektronix to acquire IST. Tr. 29:3-5. The nonbinding terms were a sale price of $7.5 million to $8.4 million, along with an additional $2 million retention pool to retain key members of the acquisition. Tr. 29:6-18. Tektronix informed Plaintiff that it wanted to retain key employees, including Plaintiff, for a term of three (3) years. Tr. 29:19-22. Thereafter, Tektronix conducted its due diligence from September until December 2017, during which IST had to upload all its source code, trade secrets, and all other intellectual property to a virtual data room for third party evaluation. Tr. 29:24-30:10.

10. At the conclusion of due diligence, Tektronix offered IST $8.4 million, but lowered the retention pool to $1.5 million. Tr. 30:11-17. Tektronix also wanted to take $800,000 owed to Plaintiff (as the largest shareholder of IST) and hold it back by way of a retention holdback agreement (the "RHA"). Tr. 30:17-20. Notably, Tektronix proposed a "holdback" agreement over an "earnout" agreement. Tr. 35:21-36:7. A holdback agreement acts as an insurance policy for items that may not have been discovered during due diligence, such as an unknown debt. Tr. 36:8-19. Conversely, an earnout is a purely performance-based agreement that is only triggered upon attainment of some performance goal. Tr. 36:20-24.

4

11.     In this acquisition, in addition to the usual agreement and plan of merger, Tektronix proposed the RHA as an insurance policy for Plaintiff's retention once the deal was complete. Tr. 36:25-37:3. The proposed RHA also contained a provision requiring that certain revenue be achieved from the use of IST's IP, which was included to ensure that IST's IP was actually incorporated into Tektronix's oscilloscope software because, as all interested parties understood, IST was not a revenue-generating company at the time of acquisition. Tr. 37:9-24.

12.     Pursuant to Section 2(a) of the initial draft of the RHA, sent December 5, 2017, the Retention Release Date is defined as:

> No later than January 15, 2021, Key Employee will be paid an amount in cash, which amount will not exceed the Retention Holdback Amount, equal to 16% of each dollar of Revenue, but only if Key Employee (i) is continuously employed by a Parent Entity from the Closing Date through December 31, 2020[.]"

DTX012.

Notably, as defined in the RHA, the Key Employee is Plaintiff, the Retention Holdback Amount is $800,000, and the Parent Entity is Tektronix. *Id.* Further, Revenue is defined as:

> [E]ach dollar of gross revenue in excess of $7,500,000 (but, for the avoidance of doubt, less than or equal to $12,500,000) generated during 2020 by any member of the Parent Group from any product or services that contains any of the intellectual property owned by the Company as of the Closing Date.

*Id.*, § 2(b)(v).

13.     During negotiations over the RHA, there were certain changes to the language included therein. Ultimately, in the execution version agreed upon, the Retention Release Date is defined as:

> No later than January 15, 2021, Key Employee will be paid an amount in cash, which amount will not exceed the Retention Holdback Amount, equal to 20% of each dollar of Revenue, but only if Key Employee (i) is continuously employed by a Parent Entity from the Closing Date through December 31, 2020[.]

5

Tr. 49:4-51:17, JTX104, § 2(a). Additionally, Revenue is defined as:

> [E]ach dollar of gross revenue in excess of $6,000,000 (but, for the avoidance of doubt, less than or equal to $10,000,000) generated during 2020 by any member of the Parent Group from or with respect to any software that contains any of the intellectual property owned by the Company as of the Closing Date.

Tr. 51:18-52:6, JTX104, § 2(b)(v).

14. Plaintiff reviewed the changes made to the RHA and reasoned as follows: the change of the terms "products or services" to "software" made sense to Plaintiff because the only IP IST had was software IP and, from Plaintiff's perspective, "products" and "software" were the same thing because you can only put software IP into software. Tr. 42:11- 25, 83:9-11, 93:22-94:18. Further, the removal of the term "services" also made sense because he saw no way for IST's software IP to be useful as a "service." Tr. 43:1-11, 82:19-83:8, 94:19-24. Additionally, he understood the addition of the term "from or with respect to" was broader than originally drafted and was meant to include revenue related to any software that contained IST's IP, wherever it may exist and whether incorporated in oscilloscopes or not. Tr. 43:12-24.

15. On December 29, 2017, just a week before the closing date, Mr. Byrne called Plaintiff and informed him that the $1.5 million retention pool was being removed from the deal. Tr. 39:25-40:11. This was done after the terms of the agreement and plan of merger had been fully approved by IST's shareholders, the effect of which was to eliminate all retention bonuses that would have been payable to IST employees who joined Tektronix (thereby not affecting the amount to be paid to IST's shareholders under the terms of the deal.) Tr. 40:12-41:3.

16. When Plaintiff asked Mr. Byrne how Tektronix planned to retain necessary IST employees, he responded that Plaintiff was the most important employee to retain, "the glue

6

that holds it together," which is why it required the RHA for him. Tr. 41:4-20. At no time during this call did Mr. Byrne and Plaintiff discuss that the revenue condition of the RHA could somehow only be satisfied by SaaS revenue or incremental revenue and had those limiting terms been part of the deal, Plaintiff stated that he never would have agreed to them. Tr. 59:8-14, 290:23-292:8.

17. On January 4, 2018, Plaintiff received a final version of the Agreement and Plan of Merger (the "Agreement") and the RHA. Tr. 42:2-10. In addition to the Retention Release Date and Revenue definitions set forth above, the executed version of the RHA also included an Entire Agreement provision, which states in relevant part:

> This Agreement, the Merger Agreement, and the documents and instruments and other agreements that are referenced herein or in the Merger Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, arrangements, communications, and understandings, both written and oral, among the parties with respect to the subject matter hereof[.]

JTX104, § 8.

Believing that the documents – especially the RHA – made sense, Plaintiff signed both. JTX102; JTX104; Tr. 42:2-10. The following day, the acquisition was completed, and IST was officially acquired by Tektronix. *Id.*

18. Upon acquisition, Tektronix purchased all of IST's IP, which is defined in the Agreement. Tr. 46:1-16; JTX102. As defined in the Agreement, the IP that Tektronix purchased is broad and inclusive, and unquestionably included IST's APIs. Tr. 46:10-48:24; JTX102; D.I. 56 at 5. Specifically, under copyrights, IST's IP included "Computer Software," which is further defined specifically to include IST's applicable source or object codes, including IST's APIs. *Id.*

7

19.     Plaintiff was directly involved in the negotiation of the language of the RHA. Tr. 52:7-11. On the other hand, neither Mr. Byrne nor Mr. Witt were involved in the negotiation of the language of the RHA at all. Tr. 59:24-60:11, 197:8-14, 259:19-260:9. Mr. Byrne provided some support of the management team, but had no involvement in the direct negotiations. Tr. 197:8-14, 236:1-4. In fact, Mr. Byrne has no recollection of ever even seeing or reviewing the RHA at any time. Tr. 228:5-8, 236:1-4. Mr. Byrne also did not know who would have drafted the language of the RHA on behalf of Defendant. Tr. 236:5-237:8.

20.     Similarly, Mr. Witt was not involved in any RHA negotiations and did not even learn about its existence until years later. Tr. 259:19-260:9. Mr. Witt's only role in the acquisition of IST was the development of the deal thesis and his involvement ended in October 2017, months before the first draft of the RHA was circulated. Tr. 282:25-283:22. Everything Mr. Witt knows about the RHA he learned after it had been executed. *Id.*

21.     The only witness at trial who was involved in the negotiation and drafting of the RHA was Plaintiff. Surprisingly, there was no testimony presented at trial from anyone at Tektronix who had firsthand knowledge of the negotiation of the RHA, the language used in it, or the language's intended meaning.

22.     As defined, the revenue condition of the RHA could have been met in several different ways. Tr. 52:21-54:18. So long as $10 million or more of revenue was generated "from or with respect" to any software containing any of IST's IP, the revenue condition would be fully satisfied. *Id.* That software would include oscilloscope software, SaaS, perpetual licenses, or any other way software could have been sold by Tektronix. *Id.*

23.     At no time did Tektronix ever attempt to limit the definition of Revenue to software as a service ("SaaS") revenue or incremental revenue. Tr. 43:25-44:7. There were never any

8

discussions between Tektronix and Plaintiff about limiting the definition of Revenue to SaaS revenue. Tr. 44:22-24. Similarly, there were never any discussions between Tektronix and Plaintiff about limiting the definition of Revenue to incremental revenue. Tr. 56:9-57:2. No documents exist that were exchanged by the parties, pre-execution, which even reference SaaS or incremental revenue. Tr. 186:16-187:6. There were also never any discussions *between the parties* about somehow excluding revenue from the sale of oscilloscopes that contained software which included IST's IP or limited the definition of Revenue as it pertained to software in any other way. Tr. 57:3-57:25. Most importantly, the language of the RHA reflects no such discussions and incorporates no such limiting language. JTX104.

### C. Plaintiff Joins Tektronix

24. After the acquisition, Plaintiff became an employee of Tektronix and immediately began the development of a software module called the Marshall Module. Tr. 54:19-56:8. The Marshall Module was written in a software language called Python that could be inserted into oscilloscope software to provide certain infrastructure for communicating with the cloud. *Id.* The development of the Marshall Module began two weeks after acquisition and took over two years to go live. *Id.*

25. IST's APIs were included in the Marshall Module that was included in Tektronix's oscilloscopes beginning in April 2020. D.I. 56 at 5; Tr. 54:19-55:5, Tr. 180:5-181:17, 238:8-21. It is undisputed that the Marshall Module did not exist prior to Defendant's acquisition of IST, and equally undisputed that the Marshall Module contains IST's APIs that were purchased in the acquisition. D.I. 56 at 5; Tr. 269:25-277:7, 277:15-279:23. Plaintiff explained how the Marshall Module's source code inside the oscilloscopes included IST's APIs. Tr. 292:9-

9

294:22. The parties stipulated that the Marshall Module's source code inside the oscilloscopes included IST's APIs. D.I. 56 at 5.

26. The oscilloscopes manufactured by Tektronix run a software called Riddick, which is the core operating system infrastructure that operates the oscilloscopes. Tr. 63:18-23. The oscilloscopes that contain the Marshall Module run Riddick and are referred to as Riddick-based oscilloscopes. Tr. 64:3-14. Those oscilloscopes generated around $10 million per month in revenue in 2020, and once the Marshall Module was incorporated into Riddick, that revenue increased to roughly $20 million per month by December 2020. *Id.* Because IST's APIs were included in the Marshall Module, which was incorporated into Riddick in April 2020, Tektronix generated far more than $10 million "from or with respect to" the sale of software that included IST's IP. Tr. 278:16-279:23. In fact, Mr. Witt confirmed that the total 2020 revenue for all products containing IST's IP (which could only be incorporated into software) was between $29,028,000 and $99,635,000 based upon Tektronix's own internal data. Tr. 281:9-282:18, 286:6-287:20; DTX71.

27. Plaintiff's other tasks included the development of cloud technologies that would be beneficial to the sale of oscilloscopes, which included the development of SaaS offerings. Tr. 60:23-62:3. Over the following three years, Plaintiff also worked on a myriad of projects as directed by Tektronix to leverage cloud software regarding licensing and subscriptions as well. *Id.* During this time, IST's IP were used in many other ways at Tektronix in addition to the APIs in the Marshall Module, including the development of TekScope and TekDrive. Tr. 62:4-63:2.

28. Plaintiff did not determine his own job responsibilities and business objectives while an employee at Tektronix. Tr. 125:15-126:2, 130:7-131:17, 132:17-24, 141:19- 142:3,

10

145:16-146:14, 187:7-16. Rather, those responsibilities and objectives were provided to him directly by his boss, Mr. Witt. *Id.* Plaintiff worked directly for Mr. Witt who set goals and objectives for Plaintiff. Tr. 258:3-21.

29. Both the Retention and the Revenue requirements of the RHA were satisfied at the conclusion of 2020. Tr. 66:3-14. Plaintiff remained employed at Tektronix through December 31, 2020, and Tektronix realized gross revenue well above $10 million from or with respect to the sale of oscilloscopes that had links or calls to the API URLs. *Id.*; D.I. 56 at 6.

## II. BREACH OF CONTRACT

### A. Legal Standard

"[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms 'establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *NAMA Holdings, LLC v. World Market Center Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007). In other words, the Court must "interpret the contract's terms according to the meaning that would be ascribed to them by a reasonable third party." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 547 (Del. Super. 2005). Delaware law is clear that "[a]mbiguity does not exist simply because the parties disagree about what the contract means" and "extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007). "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "The true test is not what the parties to the contract intended it to mean, but what

11

a reasonable person in the position of the parties would have thought it meant." *Id.* "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996).

"[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." RhonePoulenc, 616 A.2d at 1196. "In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage and course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). Importantly, the introduction of extrinsic evidence does not deviate from Delaware's adherence to the objective theory of contracts; that is, "the private, subjective feelings of negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc.*, 937 A.2d at 835.

### B. Discussion

#### 1. The RHA is Ambiguous

Whether a contract is ambiguous is a question of law. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005). The RHA defines Revenue as follows:

> "Revenue" means each dollar of gross revenue in excess of $6,000,000 (but, for the avoidance of doubt, less than or equal to $10,000,000) generated during 2020 by any member of the Parent Group from or with respect to any software that contains any of the intellectual property owned by [IST] as of the Closing Date.

JTX-104 at ¶ 2(b)(v); FF ¶ 13.

As Tektronix argued in its motion to dismiss, the Merger Agreement, entered contemporaneously with the RHA, reveals that the parties knew how to distinguish between

12

products or devices and software. The definition of "Technology" in the Merger Agreement includes "all products, tools, devices, mask works, computer programs, software, source code, …." JTX-102 at 3072. But in the RHA, the parties did not state that the revenue target was tied to "Technology" or "products" or "devices," rather they tied it to "software" and as set forth in in the proposed findings of fact above, software revenue was understood to be distinct from hardware revenue. As the Court previously recognized "'Software' means 'something used or associated with and usually contrasted with hardware." D.I. 22 at 9 (citation omitted). Mr. Bailey argued in his opposition to Tektronix's motion to dismiss that two readings of the phrase "from or with respect to any software" are plausible, the Court agreed, and held there were at least two reasonable interpretations. D.I. 22 at 10.

Because this Court holds that the contract is ambiguous, we now look to extrinsic evidence of intent presented at trial. *See Eagle Indus.*, 702 A.2d at 1233 and n.10 (Del. 1997).

### 2. Extrinsic Evidence Shows Plaintiff's Interpretation as the Reasonable Interpretation

Revenue in the RHA is defined as follows:

> [E]ach dollar of gross revenue in excess of $6,000,000 (but, for the avoidance of doubt, less than or equal to $10,000,000) generated during 2020 by any member of the Parent Group from or with respect to any software that contains any of the intellectual property owned by the Company as of the Closing Date.

JTX104, § 2(b)(v); *see* FF ¶ 13. This Court must now review extrinsic evidence to determine if revenue from sales of oscillators would be understood to qualify as revenue under the RHA.

As trial evidence confirmed, IST's APIs are IST's IP. *See* FF ¶ 18. Those APIs are comprised of unique source code developed by IST's software engineers, and which could only be used in software. FF ¶ 26. As Plaintiff explained, one could not put software IP "in a hammer." Tr. 42:22-23, 92:10-11, and 296:2. In other words, software IP is only usable in other software. *See id.*; FF

13

¶ 26. The Revenue definition of the RHA only required that Tektronix realized between $6 million and $10 million of gross revenue in 2020 "from or with respect to any software that contains any of the intellectual property owned by [IST][.]" JTX104, § 2(b)(v); FF ¶ 13. As commonly used, the phrase "with respect to" is broad; as the Merriam-Webster Thesaurus makes clear, "with respect to" is commonly interchanged with terms such as "concerning," "touching," "towards," "in view of," and "in regard to." "With respect to," *Merriam-Webster.com Thesaurus*, *Merriam-Webster*, https://www.merriam-webster.com/thesaurus/with%20respect%20to, accessed 21 Dec. 2023. In light of all of this, Plaintiff asserts that his interpretation of that phrase in the context of this case would be that the Revenue definition and the RHA's use of the phrase "with respect to" includes the sale of anything that Tektronix sold that included software incorporating IST's IP.

The evidence established that the APIs were incorporated into the Marshall Module beginning in 2018, and the Marshall Module was incorporated into Riddick, which powers Tektronix's oscilloscopes, in April 2020. *See* FF ¶¶ 25-26. The trial evidence, and the facts stipulated to by the parties in the Pretrial Order, established that the sale of oscilloscopes containing IST's IP exceeded $10 million in 2020. Had Tektronix wished to limit the definition of Revenue to only SaaS or incremental revenue, or exclude oscilloscope revenue, it could have done so.

According to the Plaintiff's trial testimony, this evolution was favorable to him in the context of the RHA for several reasons. First, IST was acquired primarily for its IP, which consisted of APIs (software created by source code). As was made clear at trial, IST's APIs could only be used by embedding them in Defendant's software – there was no other way that IST's APIs or other IP would be useful to Defendant. Tr. 42:11-25, 83:9-11, 93:22-94:18. Second, "services" was removed because it was unclear how IST's IP could be used in Defendant's "services." Tr. 43:1-11, 82:19-83:8, 94:19-24. As software created by source code, IST's IP could only be used in

14

Defendant's software. Third, the addition of the broader phrase "or with respect to" in the executed version made it clear that revenue was not limited in any way to SaaS or incremental revenue. As all parties acknowledge, if that had been the intent, that explicit language could have been included in the RHA. It was not. Tr. 43:12-24. Additionally, Plaintiff made clear at trial that, had Defendant ever communicated to him that the Revenue definition was only intended to apply to SaaS or incremental revenue, he never would have executed the RHA. Tr. 58:11-59:7. The reason for this is simple—it would have been nearly impossible for Plaintiff to satisfy that extremely limiting Revenue definition and he would have left $800,000 on the table, which he never would have done. *Id.* Instead, the language "Revenue from or with respect to any software" was used and it appears to plainly refer to the sale of oscilloscopes incorporating IST's APIs.

On the other hand, Defendant failed to provide persuasive evidence that any such limitations were discussed ***with Plaintiff*** or were incorporated in the RHA itself. This Court asked Defendant what its best evidence was that the Revenue definition of the RHA excluded the sale of oscillators that contained API URLs. Tr. 298:6-15. Defendant submitted, in essence, (1) Mr. Byrne's vague recollection of a phone call with Mr. Bailey, and (2) internal Tektronix documents. *See id.* 298:16-299:2. Turning first to the phone call, both Mr. Byrne and Mr. Bailey confirm that they spoke on the phone, though have different recollections. *See* Tr. 291:1-15. Mr. Bailey asserts that Mr. Byrne informed him that the $1.5 million retention pool was no longer included in the RHA. Tr. 90: 4-9. This concrete change was what Mr. Bailey believed was being referenced in a later email. *See* DTX25. The email to Mr. Bailey from Mr. Welch contains an email from Mr. Elston stating: "Shortly after our call, I spoke to Pat who connected with Jamie. It sounds like Jamie agreed to the revised terms of the holdback and retention. Jamie may have already related this news to you. I am working with our lawyers on the revised documents." DTX-25 at 28448. But this email does

15

not confirm that Mr. Byrne discussed excluding sales of oscillators specifically. Defendant next points to internal emails, *see. e.g.*, DTX27, that purport to explain the parties' intent. But these documents were not shared with Plaintiff. Tr. 299:3-8. Additionally, Mr. Byrne himself admitted that he was "not involved in any way" in drafting the RHA and that he does not recall if he even reviewed the RHA. Tr. 236:2-5.

Defendant called a second trial witness, Mr. Witt, to supports its position. But Mr. Witt's involvement in the acquisition ended in October 2017, two months before the first draft of the RHA was even circulated. Tr. 282:25-283:9. Mr. Witt also acknowledged that he was not involved in the negotiation of the RHA and did not even know of its existence until years after the acquisition closed. Tr. 259:19- 260:9.

The Court is also unpersuaded by Defendant's argument that post-RHA actions support its position. Mr. Bailey's subsequent actions of pursuing $10 million in software revenue and employing methods of tracking sales are attributable to Mr. Bailey acting as an employee under Mr. Witt. *See* Tr. 121:22-122:21. Defendant fails to connect Mr. Bailey's directives provided by Mr. Witt, who had no hand in the RHA and did not know of its existence at the time, to Mr. Bailey's RHA agreement.

After considering all the evidence, the Court finds that Plaintiff's interpretation of the Revenue definition in the RHA is the only objectively reasonable interpretation. Therefore, the Revenue definition in the RHA must be interpreted in accordingly.

### 3. Tektronix breached the terms of the RHA by failing to pay Plaintiff the retention holdback amount.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the

16

plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). The evidence presented at trial established that Plaintiff has satisfied all three elements by a preponderance of the evidence. First, pursuant to the terms of the RHA, Defendant was obligated to pay Plaintiff the entire retention holdback amount if Plaintiff remained employed with the Defendant through December 31, 2020, and if Defendant realized $10 million of gross revenue from or with respect to any software containing IST's IP in 2020. As explained above, the evidence at trial established both conditions were satisfied. Second, it is undisputed that Defendant has failed to pay Plaintiff the retention holdback amount and, thus, is in breach of its contractual obligation. Third, Plaintiff has been damaged due to Defendant's breach of the RHA since he has not received the full amount of the retention holdback amount. Accordingly, Plaintiff has met his evidentiary burden on the breach of contract claim.

### 4. Plaintiff is Entitled to Damages

The standard remedy for breach of contract under Delaware law are expectation damages. *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). Expectation damages are measured by the amount of money that would put the non-breaching party in the same position as if the breaching party had performed the contract. *Id.* "Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." *Id.* Here, Plaintiff's expectation was that he would be paid the entirety of the retention holdback amount should he meet the two conditions of the RHA, that is, remain employed by the Defendant through December 31, 2020, and that Defendant achieved sales revenue of $10 million or more from or with respect to any software containing IST's IP. The evidence presented at trial established that both conditions were met, and

that the retention holdback amount was $800,000. As a result, Plaintiff is entitled to the entire $800,000 retention holdback amount, plus pre- and post-judgment interest at the statutory rate.

## III. CONCLUSION

For the reasons discussed above, the Court finds that Plaintiff has met his burden to show that the terms of the RHA were satisfied and Defendant breached the terms of the RHA by failing to pay the retention holdback amount. Accordingly, the Court will enter judgment in favor of Plaintiff.

The Court hereby instructs the parties to meet and confer and submit a proposed order by which the Court may enter final judgment consistent with this Opinion. The proposed order shall be due within seven (7) days from the date of this Opinion.